John J. BUNNION, Jr., et al.,
individually and on behalf of
all others similarly situated

v.

CONSOLIDATED RAIL CORP., et al.

No. Civ.A. 97–4877.

United States District Court,
E.D. Pennsylvania.

March 23, 1999.

Stephen G. Console, Law Offices of Stephen G. Console, Philadelphia, PA, Debora A. O'Neill, The Mager Law Firm, P.C., Philadelphia, PA, Robert G. Eisler, Liebenberg & White, Jenkintown, PA, Joel C. Schochet, The Mager Law Firm, Philadelphia, PA, for plaintiffs.

Laurence Z. Shiekman, Pepper, Hamilton & Scheetz, Philadelphia, PA, Brian T. Ortelere, Pepper, Hamilton & Scheetz, Philadelphia, PA, Michael H. Rosenthal, Pepper Hamilton, L.L.P., Philadelphia,

PA, for Consolidated Rail Corporation, defendant.

Joseph J. Bellew, Cozen and O'Connor, Philadelphia, PA, for Mara J. Bellew, respondent.

Teresa F. McLaughlin, Pepper, Hamilton & Scheetz, Philadelphia, PA, Brian T. Ortelere, Pepper, Hamilton & Scheetz, Philadelphia, PA, Michael H. Rosenthal, Pepper Hamilton, L.L.P., Philadelphia, PA, for Administrative Committee of the Conrail Matched Savings Plan, Supplemental Pension Plan Administrative Committee, Flexible/Medical/Dental Dependent Plan, Life Insurance, Dismemberment and Long Term Disability and Retirees Life Insurance Plan, Severance Plan, Deborah A. Melnyk, Richard J. Davison, Peter F. Barr, Christian D. Hill, Marianne S. Gregory, Gerhard A. Thelen, John A. McKelvey, Richard D. Huffman, defendants.

Teresa F. McLaughlin, Brian T. Ortelere, Michael H. Rosenthal, Pepper Hamilton, L.L.P., Philadelphia, PA, for Dale A. Shaub, Fiduciaries and Administrators of the Foregoing Plans and Other Doe Fiduciaries, Supplemental Pension Plan of Consolidated Rail Corporation, defendants.

## MEMORANDUM

BARTLE, District Judge.

This is a class action lawsuit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* The plaintiffs, former employees of the defendant, Consolidated Rail Corporation ("Conrail"), challenge the legality of certain actions Conrail took with respect to its employee pension plan, and more specifically with respect to its voluntary separation program, which the plaintiffs accepted in 1996.[1] There are also age discrimination and pendant state law claims. Presently before the court are plaintiffs' motion for summary judgment as to Counts II and XIV, defendants' motions for summary judgment as to all Counts,[2] and defendants' motion for additional discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

After granting in part and denying in part successive motions to dismiss the complaint and amended complaint, we certified a plaintiff class of "all persons formerly employed by Conrail at any Conrail location who separated from Conrail as part of the March 1, 1996 Conrail Voluntary Separation Program" with respect to the ERISA claims in Counts I, II, III, and VI and the fraud claims in Count IV, the negligent misrepresentation claim in Count V, and the estoppel claim in Count XIV. *Bunnion v. Consolidated Rail Corp.,* No. CIV. A. 97–4877, 1998 WL 372644 (E.D.Pa. May 14, 1998); *see also Bunnion* (E.D.Pa. May 18, 1998); *Bunnion* (E.D.Pa. March 23, 1998); *Bunnion,* 1998 WL 32715 (E.D.Pa. Jan. 6, 1998). We also certified one subclass of "those VSP participants who returned to work for Conrail in positions of employment which Conrail designated as non-employee status" with respect to the ERISA claims in Counts VIII, IX, and XIII, and another subclass of "those class members over 40 years of age who were returned to work into non-employee status" with respect to the age discrimination claim in Count VII. *Bunnion,* 1998 WL 372644 (E.D.Pa. May 14, 1998).

We may grant summary judgment only if there is no genuine issue of material fact and the moving party is entitled to sum-

---

1. Plaintiffs have sued Conrail, the Conrail Matched Savings Plan, the Matched Savings Plan Administrative Committee, the Conrail Supplemental Pension Plan, the Supplemental Pension Plan Administrative Committee, the "flexible/medical/dental dependent plan, life insurance, dismemberment and long term disability and retirees life insurance plan, severance plan," Deborah A. Melnyk, Richard J. Davison, Peter F. Barr, Christian D. Hill, Gerhard A. Thelen, Marianne S. Gregory, John A. McKelvey, Richard D. Huffman, Dale A. Shaub, and the alleged fiduciaries and administrators of the named plans.

2. Defendants filed a separate motion for summary judgment on Count VII, an age discrimination claim.

mary judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We review all evidence and make all reasonable inferences from the evidence in the light most favorable to the non-movant. *See Wicker v. Consolidated Rail Corp.*, 142 F.3d 690, 696 (3d Cir.), *cert. denied*, 525 U.S. 1012, 119 S.Ct. 530, 142 L.Ed.2d 440 (1998).[3]

## I.

The following facts are undisputed. Conrail maintained a benefit plan for its employees known as the Matched Savings Plan/Employee Stock Ownership Plan ("MSP/ESOP"). The MSP/ESOP was comprised of both an Employee Stock Ownership Plan ("ESOP") and a "cash or deferred arrangement within the meaning of Code section 401(k)." Conrail Matched Savings Plan, Introduction. We previously described this plan in our decision in *Bennett v. Conrail Matched Sav. Plan Admin. Comm.*, Nos. CIV. A. 97–4535, 97–5017, 97–5345, 1997 WL 700538 (E.D.Pa. Oct. 30, 1997), *aff'd*, 168 F.3d 671 (3d Cir. 1999). The plan is governed by ERISA, 29 U.S.C. §§ 1001 *et seq.*, and is a "defined contribution plan," also known as an "individual account plan." 29 U.S.C. § 1002(34). Such a pension plan "provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." *Id.* Under the terms of Conrail's MSP/ESOP, upon termination of employment or retirement, disability, death, or certain financial hardships, an individual was entitled to distributions of up to the total amount which had been allocated to his or her individual account.

The balance in each individual's MSP/ESOP account included the amount the individual contributed from his or her own earnings plus matching contributions of up to 100% of the individual's annual contribution.[4] The source of the matching funds was a combination of direct contributions from Conrail and its "participating affiliates" and stock released from the MSP/ESOP "Unallocated Stock Account." Conrail Matched Savings Plan, §§ 4.1, 4.4. The MSP/ESOP could borrow money in order to purchase certain Conrail securities. The stock acquired with the borrowed funds was kept in the Unallocated Stock Account, which was separate from the individual participants' accounts. Each year, a portion of the stock in this account was to be released for allocation to participants' accounts. *See id.* at § 7.2. Any remainder built up in the Unallocated Stock Account.

In the mid–1990's, Conrail management began to do annual studies to compare the company, its functions, and its level of efficiency to other railroads throughout the nation. These studies also explored whether Conrail should change any of its operations. As a result, Conrail decided it needed to reduce its expenses by $30–60 million dollars. On February 21, 1996, the President and CEO of Conrail, David LeVan, wrote to the company's employees, "Conrail is announcing early retirement and voluntary separation programs that we hope will reduce our non-agreement workforce by 900 employees by 1998.... [W]e are seeking first to reduce our non-agreement workforce though voluntary programs that provide a transition into retirement or another career." An e-mail entitled "Conrail Newswire, Special Edition" disseminated later that same day told employees, "If the 900–position goal is not achieved through the voluntary programs, Conrail expects to achieve the additional

---

**3.** We note that we would also be the fact finder for the ERISA claims, should they survive summary judgment.

**4.** The matching contributions were capped at 6% of an individual's annual earnings.

reductions through non-voluntary separation programs."

In early March, 1996, Conrail distributed written materials to eligible employees to explain the voluntary separation program ("VSP"). Included was a March 1 letter from the Assistant Vice President of Compensation and Benefits, which stated, "As Dave LeVan told all of us in his announcement on February 21st, Conrail intends to reduce its non-agreement workforce by approximately 900 people over the next couple of years." The letter announced that the process Conrail would use to reach the 900–person reduction goal was comprised of four components. The first two, which Conrail would offer concurrently, were the VSP and the Voluntary Retirement Program. The other two components, to be offered concurrently and "as deemed necessary by management after completion of the voluntary offerings," were an "Involuntary Staff Rationalization," and a "Workforce Redeployment Program." While these components were not explained in detail in the record, they involved mandatory terminations and reassignments.

The VSP was generally open to all non-union employees who had completed fifteen or more years of Conrail service. It provided for a separation payment of at least two years' salary,[5] an expense allowance of $5,000, and in some instances a relocation allowance. Eligible employees interested in participating in the VSP were required to submit an application, including a signed "general release." The deadline for doing so was April 23, 1996. The VSP plan description materials provided that an employee could unilaterally revoke his or her application during the seven days after it was submitted. While Conrail reserved the right to accept or reject each application, it had to notify by April 29, 1996 all employees whose applications had been rejected. Conrail also reserved

the right to delay an accepted applicant's termination date until, at the latest, April 30, 1997. Unless they received a directive from Conrail about a delayed termination date, accepted applicants were terminated effective April 30, 1996. After acceptance into the VSP but before the employee's termination date, the employee could rescind participation in the VSP, but only if it was agreeable to Conrail.

Conrail held informational meetings to explain the VSP program to eligible employees. At these meetings, attendees were given the opportunity to ask questions. Conrail also made use of a "SepINFO bulletin board," an e-mail distribution system, to disseminate information about the VSP and to allow employees to ask questions. None of the parties has explained how the SepINFO bulletin board worked or how many Conrail employees had access to it.

On March 8, 1996, at a general VSP informational meeting with approximately 100 people in attendance, a Conrail employee asked what effect VSP participation would have on one's right to share in any distribution of the unallocated ESOP surplus if the MSP/ESOP should happen to be terminated. The Director of Compensation and Benefits, who was also a plan administrator for the MSP/ESOP, told the questioner and the audience she did not know the answer but would obtain it. On March 19, the Director distributed an e-mail message to employees via the SepINFO Bulletin Board in the form of a question and answer. That e-mail provided:

The following are answers to the questions that have been asked at the VRP/VSP meetings that have been held across the system over the last couple weeks: . . . .

Q) In the unlikely event that the Conrail Matched Savings Plan/ESOP were to be terminated in the future, how would the undistributed shares be allocated?

---

5. If an individual had over twenty-four years of Conrail service, he or she would receive a separation payment of two years' salary plus one month's salary for each year or partial year of service in excess of twenty-four years.

A) The Conrail Treasury Department advises that the undistributed shares would first be used to pay off the loan that purchased the ESOP shares originally. If there were remaining undistributed shares, one of the alternatives would be to give a prorated allocation to all participants (anyone who has an account balance in the Plan at the time of the distribution.)

Each of the plaintiffs applied for and was accepted into the VSP. Because Conrail delayed the termination of some of the plaintiffs, their last dates as employees varied. Some of the plaintiffs, after their termination dates passed, returned to work in what Conrail designated as "independent contractor" or "leased" employee positions. In this new status, they did not receive the fringe benefits to which regular, full-time Conrail employees were entitled. Certain of those individual performed the same duties as they performed prior to their VSP termination dates.

Months after the April 30 VSP deadline passed, Norfolk Southern Corporation and CSX Corporation agreed to acquire Conrail. A new entity formed by these two companies made a successful tender offer in the spring of 1997 for Conrail's outstanding stock. *See Bennett,* 1997 WL 700538, at *2. Effective June 2, 1997, the jointly owned company merged with Conrail. *See id.* Shortly before, on May 20, 1997, Conrail "terminated" the MSP/ESOP, effective May 22.[6] Conrail then amended the plan on July 15, 1997, to provide for allocation of its unallocated assets. Individuals remained entitled to distributions of all amounts credited to their accounts. Stock held in the Unallocated Stock Account was converted to cash, and a method of allocating that sur-

plus to individual accounts was established. The cash proceeds were to be dispersed first to satisfy all outstanding ESOP loans and then to make any matching contributions required up until April 30, 1997. What remained was to be allocated to individual accounts based on employees' earnings, as defined in the plan, for the years 1996, 1997, and for each subsequent year until the account was depleted. Earnings, for the purpose of these calculations, excluded any amounts earned as "independent contractors" or "leased" employees.

Plaintiffs contend that $539 million of unallocated assets were left over after the plan's loans were satisfied. Because none of the plaintiffs was discharged earlier than April 30, 1996, presumably they received a portion of the allocations of the MSP/ESOP surplus based upon at least four months of 1996 income. Those plaintiffs whose termination was delayed remained regular status Conrail employees for a longer period. Accordingly, they received allocations from the MSP/ESOP surplus based on more than four months of 1996 income and, in some instances, on income up until April 30, 1997. Plaintiffs assert, however, that because Conrail violated ERISA and other federal and state laws in securing their participation in the VSP, they did not receive the full amount of surplus to which they were entitled. They aver that they have lost collectively over $49 million in MSP/ESOP allocations.

## II.

■ Defendants first argue in support of their motion for summary judgment that the general release the plaintiffs signed as part of their VSP applications bars the claims in Counts I, II, III, IV, V, VI, XII, and XIV.[7] *See* Def's Mem. of Law

---

**6.** "Terminated" in this context meant that individual contributions ceased, no employees could become new participants in the plan, and the plan's assets were to be distributed in accordance with its terms.

**7.** In their memorandum of law in support of their motion, defendants argue that the re-

lease broadly bars plaintiffs' claims "for any alleged wrongdoing associated with their Conrail employment and the VSP," but later advance a more limited argument that it only bars "plaintiffs' claims arising prior to the Release." Def's Mem. of Law in Support of Mot. for Sum.J. on all Counts Other than Count VII, pp. 14, 16, 19.

in Support of Mot. for Sum.J. on all Counts other than Count VII, p. 12 n. 11. The general release provided in relevant part:

> Intending to be legally bound, I hereby release and discharge CONRAIL, its subsidiaries, affiliates, and its and their officers, employees, directors, agents, and its and their respective successors and assigns, heirs, executors and administrators (hereinafter referred to as "Releasees") from any and all claims, liabilities, charges, obligations, promises, agreements, controversies, damages, expenses, causes of action, suits, debts, and demands of any nature, known or unknown, which I ... may have against CONRAIL or any of the Releasees from all time up to the date on which I have signed this General Release. This General Release includes, but without limitation, any and all claims relating in any way to my employment by CONRAIL and my participation in the Voluntary Separation Program. . . .

We recently discussed this same release in *Buxton v. Consolidated Rail Corp.*, Civ. A. No. 98–2409, 1999 WL 46610, at *3 (E.D.Pa. Jan. 6, 1999). As explained in *Buxton,* the release bars all claims the employee may have had "from all time *up to* the date on which ... [he or she] signed this General Release." (emphasis added). Although the second sentence may appear to bar "all claims relating in any way" to the VSP, when the first and second sentences are read together, it is clear that the second sentence is merely an illustration of the types of claims included within the first sentence. "[U]nder Pennsylvania law it is well settled that 'releases are strictly construed so as not to bar the enforcement of a claim which had not accrued at the date of the execution of the release.'" *Youngren v. Presque Isle Orthopedic Group, Inc.*, 876 F.Supp. 76, 79 (W.D.Pa.1995) (quoting *Vaughn v. Didizian,* 436 Pa.Super. 436, 648 A.2d 38, 40 (1994)). Thus, the only claims barred by

the plain language of the release are those which accrued before the plaintiffs signed the releases.

■ The defendants, who bear the burden of establishing that the releases bar plaintiffs' claims, have not come forward with any evidence indicating when any of the plaintiffs signed the releases. The application materials were distributed to employees in early March, 1996. Therefore, it is possible that plaintiffs could have signed the releases at any time between early March and April 23. Construing the evidence in favor of the non-movants, we will assume plaintiffs executed their releases on March 1. As to those claims that challenge actions which took place after March 1, 1996, defendants have not established as a matter of law that they are entitled to judgment. Nor have defendants convinced us that any of the claims accrued before that date. *See id.* Defendants,' motion for summary judgment on Counts I, II, III, IV, V, VI, XII, and XIV on the ground that they are barred by signed releases will be denied.

### III.

■ Count II of plaintiffs' amended complaint, on which both sides seek summary judgment, is a claim that defendants breached the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). ERISA is a comprehensive framework enacted "to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). ERISA § 404(a) requires the fiduciary of a plan governed by ERISA to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... [and] with the care, skill, prudence, and diligence ... that a prudent man acting in a like capacity ... would use." 29 U.S.C. § 1104(a)(1).[8] A fiduciary breaches these

---

8. ERISA defines a fiduciary as follows:

[A] person is a fiduciary with respect to a

obligations if it makes affirmative material misrepresentations to plan participants or beneficiaries about the terms of the plan. *See In re Unisys Corp. Retiree Medical Benefit ERISA Litig.,* 57 F.3d 1255, 1264 (3d Cir.1995); *Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226, 238 (3d Cir.1994); *Fischer v. Philadelphia Elec. Co.,* 994 F.2d 130, 135 (3d Cir.1993). "Put simply, when a plan administrator speaks, it must speak truthfully." *Fischer,* 994 F.2d at 135. A fiduciary may also breach its duties if it fails to provide material information to plan participants or beneficiaries when it knows its silence might cause them harm. *See Unisys,* 57 F.3d at 1264; *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1300 (3d Cir.1993). In order to prove a claim of breach of fiduciary duty, plaintiffs must establish four elements: (1) the defendants' fiduciary status; (2) material misrepresentations; (3) defendants' knowledge of the confusion among beneficiaries; and (4) resulting harm to plaintiffs. *See Unisys,* 57 F.3d at 1265; *Fischer,* 994 F.2d at 135.

Plaintiffs first maintain that some of the defendants breached their fiduciary duties by misrepresenting that Conrail intended to eliminate 900 jobs and that if a sufficient number did not chose to participate in the VSP, Conrail would achieve its goal through involuntary discharges. This alleged misrepresentation was intended, according to plaintiffs, to induce employees to accept the VSP out of fear of involuntary termination with fewer accompanying severance benefits. As it turned out, Conrail never resorted to involuntary terminations, and no evidence exists that they were necessary in light of the number of those who elected the VSP. Nonetheless, plaintiffs maintain that despite Conrail's statements to the contrary, it never intended to eliminate 900 employees unless it could do so through voluntary means.

■ The statements to which plaintiffs refer include President LeVan's February 21, 1996 announcement, the news bulletin posted on Conrail's SepINFO bulletin board the same day,[9] and the March 1 letter that accompanied the VSP informational materials. However, there is no evidence that these statements which warned of involuntary terminations were anything but honest declarations of Conrail's present intent to do a future act if a precondition (900 reductions via the voluntary programs) did not occur. Even if the voluntary programs cut less than 900 employees, a later decision by Conrail not to resort to the involuntary separations does not raise a genuine issue of material fact that the earlier declarations were misrepresentations. *Cf. Frahm v. Equitable Life Assurance Soc'y,* 137 F.3d 955, 961 (7th Cir.) (Easterbrook, J.), *cert. denied,* 525 U.S. 817, 119 S.Ct. 55, 142 L.Ed.2d 43 (1998).

Plaintiffs' reliance on Conrail's own financial studies does not raise a genuine issue of material fact. Plaintiffs argue that defendants' statements about involuntary reductions were misrepresentations

---

plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). We will assume for the purposes of our discussion that plaintiffs have demonstrated that each of the defendants named in this Count is a fiduciary.

9. It is crucial to plaintiffs' classwide claim that these alleged misrepresentations were made to a wide audience. With respect to the messages "posted" on the SepINFO bulletin board, however, plaintiffs have not shown us any facts explaining how many of them had access to the system or how many of them saw the relevant messages. We will assume, for the sake of argument, that the e-mail messages were read by each of the plaintiffs shortly after they were posted by the author.

because Conrail's financial studies demonstrated that it would not achieve as large a cost reduction if it resorted to involuntary terminations as it would if it obtained voluntary terminations.[10] However, evidence showing that Conrail may have been able to save *more* through voluntary separations does not mean that it would not have undertaken involuntary terminations to reach its 900–person reduction goal. It strains credulity to say that if the VSP failed to achieve satisfactory results, Conrail would have given up completely and not have tried to achieve a portion of its savings goal through mandatory separations.

In further support of their claim that Conrail falsely threatened involuntary terminations, plaintiffs maintain that, during March and April, 1996, defendants misrepresented to some of the individual plaintiffs that the facilities and departments in which they worked were in danger of closure. For example, plaintiff Frances Bronson testified at her deposition that during a meeting held at the Island Avenue facility, she heard from an unidentified source "the Island Avenue *might* be closed . . . . [t]hat the building would close, would *probably* not be there in January of 1997." (emphases added). Then, there is plaintiff John Hollner. He attended a meeting with Mr. Poff and Mr. McCarthy, whose positions at Conrail have not been identified. According to Hollner, the two men "indirectly" encouraged him to participate in the VSP because "they figured that I would *possibly* be out of a job in a year's time." (emphasis added). Class representative John Bunnion testified at his deposition that he "heard from Andrew Mancini that Vice President Passa said that the Island Avenue facility would be closed if Conrail did not get enough people to participate in the voluntary separation." [11] Bunnion also recounted that he discussed with Mr. Schimmel, Conrail's Secretary and Assistant Vice President, his concern about the closure of Island Avenue. According to Bunnion, Schimmel then made a phone call to Senior Vice President Jim McKelvey, after which he told Bunnion, "I'd advise you to apply for the VSP because of what I just heard from McKelvey because there will be mass layoffs, and what Passa told Mancini was *probably* true." (emphasis added).

There is no indication that these statements about what "might" or what "possibly" or "probably" could happen were untrue when made. Moreover, the only evidence that plaintiffs have presented to show that these were misrepresentations is the fact that the facilities or departments in question were not ultimately closed. Plaintiffs' argument with respect to these statements fails for the same reasons as noted earlier. Merely because the facilities and departments continued to operate, without more, does not raise a genuine issue of material fact that the earlier statements were false at the time they were made. *Cf. Frahm*, 137 F.3d at 961.

In addition to the purported misrepresentations about involuntary terminations, plaintiffs contend, in support of their ERISA breach of fiduciary claim, under § 404(a), that certain of the defendants misled them into believing that if they

---

**10.** Plaintiffs contend that involuntarily terminated employees were entitled to benefits under Conrail's Staff Rationalization Plan ("SRP"), which provided for a payment of 75% of one year's salary. In contrast, the VSP provided for a payment of at least two years' salary, an expense allowance of $5,000, and in some instances a relocation allowance. Plaintiffs explain how involuntary reductions were "costlier" to Conrail, even though the employees received less in such a scenario, by noting that benefits under the SRP were paid out of Conrail's general operating income (and thus impacted the "administrative expense" equation), while benefits under the VSP were paid out of the Supplemental Pension Plan (which did not impact Conrail's "administrative expense" equation).

**11.** The amended complaint avers that Andrew Mancini was the Director of the Island Avenue facility, but we are not aware of any evidence regarding what his position was.

signed up for the VSP, they would have an opportunity to participate in potential future allocations of the unallocated surplus in the MSP/ESOP. They assert that these misrepresentations also were made to induce them to accept the VSP. Plaintiffs focus on the March 19, 1996 e-mail from the Director of Compensation and Benefits. As noted above, the e-mail provided, in relevant part:

The following are answers to the questions that have been asked at the VRP/VSP meetings that have been held across the system over the last couple weeks: . . . .

Q) In the unlikely event that the Conrail Matched Savings Plan/ESOP were to be terminated in the future, how would the undistributed shares be allocated?

A) The Conrail Treasury Department advises that the undistributed shares would first be used to pay off the loan that purchased the ESOP shares originally. If there were remaining undistributed shares, one of the alternatives would be to give a prorated allocation to all participants (anyone who has an account balance in the Plan at the time of the distribution.)

As we stated previously, plaintiffs have not directed us to anything in the record as to who had access to the SepINFO bulletin board system and who read this message. For the purposes of our discussion, however, we will assume that this e-mail was read by a wide audience.

■ As a starting point, we must emphasize that there is absolutely no evidence before us that Conrail had given any consideration whatsoever, on or before the April 23, 1996 VSP application deadline, to terminating the plan. Conrail stated in the question framed in the e-mail that termination of the MSP/ESOP was an "unlikely event." At the time, that was true. Plaintiffs argue, however, that the defendant spoke falsely when it said "one of the alternatives" would be to distribute any unallocated surplus to "all participants (anyone who has an account balance in the

Plan at the time of the distribution.)." Again, plaintiffs have produced no facts to support their contention.

Plaintiffs direct our attention to Article II of the MSP/ESOP, which reads, "A Participant shall cease to participate in the Plan as of . . . the first day in which his employment with Conrail and Participating Affiliates ceases . . ." They claim that this provision shows that terminated employees, even those with account balances, could not be participants and thus could not share in allocations of the surplus. Plaintiffs fail to note, however, that the MSP/ESOP provided that the group of those treated as participants is broader than the group defined in Article II:

"*Participant*" means an Employee participating in the Plan in accordance with Article II. Except for purposes of Articles III and IV, and except as otherwise provided in Article IX, an Employee not participating in the Plan in accordance with Article II shall continue to be treated as a Participant until all benefits due him under the Plan have been paid.

The second sentence of this definition states that someone whose Conrail employment had been terminated but who maintained a balance in their MSP/ESOP account after termination would "continue to be treated as a Participant" until he or she had withdrawn his or her total individual account balance. Therefore, consistent with the March 19 e-mail, it was possible that such individuals would be treated as participants for the purpose of allocating the unallocated surplus if the plan were to be terminated.

■ The MSP/ESOP also contained an unambiguous right-to-amend clause which permitted Conrail's board of directors to amend the plan "at any time and in any manner, without prior notification, consultation, or bargaining with any Employee or representative of Employees." Conrail Matched Savings Plan, § 14.1. An ERISA defined contribution plan, such as the MSP/ESOP, "provides . . . for benefits

based solely upon the amount contributed to the participant's account." 29 U.S.C. § 1002(34). The plaintiffs here are not arguing that they have not received or will not receive all of what was allocated to their individual accounts. As for the unallocated surplus, we previously concluded and the Court of Appeals agreed that it was a plan asset, and individual participants did not have any entitlement to it under ERISA. *See Bennett,* 1997 WL 700538, at *5; *Bennett,* 168 F.3d at 676–78. "Unallocated assets are not the same as accrued benefits. ERISA protects only anticipated benefits, not surplus assets." *Bennett,* 168 F.3d at 676. Regardless of how the plan defined participants in March and April, 1996, Conrail could amend the plan to dispose of the surplus by allocating it to a different class of "participants" or, for that matter, to no participants at all. In short, Conrail had at its disposal at that time a potentially infinite number of options for disposing of the unallocated surplus, including the one mentioned in the March 19, 1996 e-mail.

Plaintiffs contend that defendants admitted liability for breach of fiduciary duty. In their memorandum in opposition to plaintiffs' motion, defendants wrote, "There was absolutely no provision in the then-existing version of the Matched Savings Plan [as of March 1996] for the allocation of surplus ESOP assets. . . . That allocation could only have been accomplished by plan amendment." Plaintiffs' argument is off the mark. The March 19 e-mail spoke about possible future events. The fact that the plan in effect on March 19 did not have a clause regarding allocation of the plan's surplus upon termination does not bear on the accuracy of the e-mail's statement about what might happen in the future if Conrail decided to terminate the plan.

Plaintiffs further argue that Conrail admitted liability when its benefits attorney testified at his deposition, "The plan [in effect on March 19, 1996] states that once you cease employment you cease partic-

ipation in the plan, so I don't think someone who left under the . . . VSP would be a participant. . . . [S]ince they would not still be considered participants they would not be *entitled* to an allocation." (emphasis added). Plaintiffs have cited no case law to advance their position that the deposition testimony of an inside attorney of Conrail at his level binds it for purposes of this litigation. In any event, regardless of whether he was correct about who was a participant, the attorney's salient point was that those who accepted the VSP were not "entitled" to an allocation of the unallocated surplus at the time of their termination. About this he was correct, but this does not advance the ball for plaintiffs because the e-mail did not speak of entitlement. It spoke only of potential future occurrences and options. There was nothing in the terms of the plan in effect on March 19 which precluded Conrail, in the event of plan termination, from allocating the surplus to those employees who had elected the VSP. The attorney said nothing to the contrary.

In summary, the March 19 e-mail clearly spoke about plan termination as an "unlikely event." It is undisputed that this was accurate at the time it was sent. The e-mail explained that the unallocated surplus would first be used to pay off the ESOP loans. This was also accurate. Even if termination occurred and unallocated surplus existed at that time, Conrail did not falsely promise in the e-mail that VSP participants would share in it. Conrail simply said it was one of any number of options that Conrail might elect. Again, there is nothing inaccurate about this.

█ In order to make out an ERISA claim for breach of fiduciary duty under § 404(a), plaintiff must be able to establish that any misrepresentation was material. *See Unisys,* 57 F.3d at 1264; *Curcio,* 33 F.3d at 238; *Fischer,* 994 F.2d at 135. "[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if

and when to retire." *Fischer*, 994 F.2d at 135. Summary judgment based on the issue of materiality is appropriate "only if 'reasonable minds cannot differ.'" *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

Even assuming that the March 19 e-mail was somehow inaccurate about whether those accepted into the VSP continued to be participants, any inaccuracy was not material. The question that was presented in the March 19 e-mail asked Conrail to make a prediction about what might happen if a presently unplanned event (plan termination) occurred under circumstances in which the plan had an unallocated surplus. "ERISA does not impose a 'duty of clairvoyance' on fiduciaries.... An ERISA fiduciary is under no obligation to offer precise predictions about future changes to its plan." *Fischer*, 994 F.2d at 135 (quoting *Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1164 (6th Cir.1988)).

We cannot be blind to common sense.[12] Conrail employees are real people immediately concerned about providing for themselves and their families. Like most working individuals, they have mouths to feed and mortgages or other bills to pay. No reasonable Conrail employee who faced a decision in March and April, 1996 on whether to elect the VSP would have considered an unlikely future event (with no date suggested by which that event might occur) involving an unknown quantity of money to be a material consideration in making that decision. The hypothetical and conditional question and answer in the e-mail could hardly have misled a reasonable employee in making an "adequately informed decision" about whether to accept the VSP.[13] *Id.* On this, we believe

"'reasonable minds cannot differ.'" *Id.* (citation omitted).

Plaintiffs have pointed to a few other alleged misrepresentations regarding eligibility for future allocations from the ESOP surplus. According to plaintiffs, "implicit in the answer" to a "Q & A" distributed to eligible employees as part of their VSP package was the misrepresentation that those who accepted the VSP and kept a balance in the MSP/ESOP would remain eligible for distributions from the surplus upon plan termination. We disagree. The Q & A states:

Q. Can I keep my account in the Matched Savings/ESOP Plan if I elect the voluntary separation?

A. If you are under age 65 and have an account balance in excess of $3,500, you may choose to have that account balance remain in the Plan until reaching age 65 or an earlier date following a calendar quarter that you select. However, all outstanding loans must be fully repaid within 90 days of your separation date; otherwise, the account must be distributed to you.

This statement says nothing about what may happen to any unallocated surplus if the plan is terminated. It merely announces that some VSP participants may elect to keep balances in their accounts after termination, and plaintiffs have not argued that this was untrue.

Plaintiffs submit that at an informational meeting held at Conrail's Mount Laurel, New Jersey, facility in March, 1996, the Senior Director of Compensation and Benefits Strategies made misrepresentations similar to those in the March 19 e-mail. In support of this claim, plaintiffs cite to the depositions of two of the named plaintiffs. Anthony Falcone testified:

---

**12.** We note again that on this non-jury ERISA claim, we would also be the fact finder at any trial.

**13.** Indeed, defendants have pointed to evidence that 323 of the 578 VSP participants withdrew all amounts from their MSP/ESOP accounts before the plan was terminated ef-

fective May 22, 1997. Because these withdrawals occurred within a year of their acceptance into the VSP, this evidence is a strong indication that these participants did not consider the possibility of obtaining distributions of the unallocated surplus material to their decision to accept the VSP.

One question was asked about your involvement in the 401–K and the ESOP, that if you took the VSP, could you clarify what your involvement would be after the VSP. And ... [the Director] explained that as long as you were in the Conrail 401–K plan, that you would still be an active member in the ESOP program, as it related to whatever shares of Conrail stock that you had in your 401–K.

Falcone's testimony appears only to say that an individual who participated in the VSP and maintained an account balance was an "active member" in the sense that he or she remained entitled to all amounts in his or her account. It says nothing about allocations of the MSP/ESOP surplus upon plan termination.

Plaintiff John Bunnion testified in his deposition that at the Mount Laurel meeting, the Director stated that "after the loan was repaid, ... we would be ... eligible for any ESOP benefits paid after we had left if we were still in the ESOP plan." When asked to clarify what were the benefits to which he was referring, Bunnion stated, "any monies that are left." Like Falcone, Bunnion did not testify that the Director told him that if he accepted the VSP, he would be "entitled" to any of the plan's surplus upon plan termination. Neither Falcone's nor Bunnion's deposition identifies a misrepresentation made by Conrail.

The plaintiffs also rely on an alleged misrepresentation in an e-mail sent from Conrail's Assistant Vice President of Compensation and Benefits to class member Louise Menna. The e-mail is dated August 6, 1996. Menna had directed the following question to the Assistant Vice President:

[I]n a March 19 communication from [the Director of Compensation and Benefits] ... on ... VSP questions and answers, there was a question concerning the ESOP. The answer said that one of the alternates [sic] would be to give a prorated allocation to all participants (any-one [sic] who has an account balance in the Plan at the time of the distribution.) Does this include VSP ... people who have left but still keep their 401K money in Conrail's plan?

The Assistant Vice President replied, "The answer is yes, because those people are still participants; however, the distribution after paying off the loan would likely be small, if at all, and the proration would be on an account balance basis, not on a per capita basis." Plaintiffs, again citing the previously mentioned deposition testimony of Conrail's benefits attorney, contend that this response was a misrepresentation because "those people" were not, in fact, "participants." This argument is not persuasive for the same reasons it was not persuasive with respect to the March 19 e-mail. Furthermore, there is no evidence that any plaintiff other than Menna read the August 6 e-mail. Significantly, this e-mail was sent more than three months after plaintiffs' participation in the VSP became finalized. By this time, plaintiffs could not rescind their VSP applications without Conrail's approval. Plaintiffs have not produced any evidence to show how this alleged misrepresentation caused any "resulting harm." *Unisys,* 57 F.3d at 1265.

■ Plaintiffs have not supported their argument that defendants violated their fiduciary duties as a result of any omissions. They assert that defendants failed to tell them that their eligibility for allocation of the surplus would be detrimentally impacted by their VSP participation. Defendants surely had no duty to disclose something which was not known or even being considered. *See Fischer,* 994 F.2d at 135. No thought was being given in March or April, 1996 to plan termination. Plaintiffs also argue that even if the March 19 e-mail was correct that they might share in the allocation of the surplus, it was misleading because it did not inform employees of all the other options. We are not persuaded. The fact that the e-mail set forth one of the options for dis-

tribution of any future surplus did not give rise to a duty to disclose all of the infinite options for distribution. That would be totally unrealistic. Conrail clearly announced that distribution based on the account balance was merely "one of the alternatives." By implication, other less favorable options might eventuate.

The case before us stands in stark contrast to the Supreme Court's decision in *Varity*, on which plaintiffs rely. In *Varity*, the employer, which also served as the ERISA welfare plan administrator, intentionally assured employees that if they transferred employment to its subsidiary, the security of their ERISA welfare benefits would not be affected. *See Varity Corp. v. Howe*, 516 U.S. 489, 501, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). However, when making these statements, the defendant knew that there was a substantial possibility that the subsidiary would fail. *See id.* at 493, 116 S.Ct. 1065. The Supreme Court, upholding the district court's judgment in favor of the plaintiffs, stated that the intentional misrepresentations violated the employer's fiduciary duties as a plan administrator because " '[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries.' " *Id.* at 506, 116 S.Ct. 1065 (quoting *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.,* 698 F.2d 320, 326 (7th Cir.1983)) (brackets in original). In *Varity*, unlike here, there was evidence of intent to deceive.

The Third Circuit's *Unisys* case, on which plaintiffs also rely, further demonstrates the absence of a breach of fiduciary duty by Conrail. There, the ERISA plan administrator, the employer, had repeatedly and unequivocally assured employees and retirees that their medical benefits were "for life," when in fact the plan allowed the employer to terminate those benefits, which it eventually did. *Unisys,*

57 F.3d at 1266. Reinstating the fiduciary duty claim after it had previously entered summary judgment for defendants,[14] the district court explained, "the company, both actively and affirmatively, systematically misinformed its employees about the duration of their benefits by stating over and over again, without qualification, that their benefits would continue for life." *Id.* at 1266. The Court of Appeals affirmed the district court's decision to reinstate the claim. *Id.* at 1267. *Unisys* differed from the present action in that in the former there was evidence that the statements at issue were untrue when made.

Finally, this case is distinguishable from *Fischer,* a Third Circuit case in which the Court decided that the evidence precluded entry of summary judgment for defendants in a claim of breach of fiduciary duty. Prospective retirees had asked the defendant company, which served as the ERISA plan administrator, about the possibility that the company would adopt an early retirement incentive program. Benefits counselors answered in the negative or stated that they had no knowledge of any such plan. *See Fischer,* 994 F.2d at 132. The Court of Appeals determined that if an early retirement incentive plan was being given "serious consideration" at the time the benefits counselors said they were being given no consideration, the statements *might* constitute a breach of fiduciary duty. *Id.* at 135. The employer could not circumvent its fiduciary duty to speak truthfully about the plan and its amendments by building a "Chinese wall" around the benefits counselors. *Id.* The Court concluded that there were genuine issues of material fact precluding summary judgment. *See id.* In contrast to *Fischer,* at the time the March 19 e-mail was sent, plan termination was not being considered, much less seriously considered.

14. The district court had granted summary judgment in favor of the defendant on the breach of fiduciary duty claim. Plaintiffs' breach of contract claim went to trial. During trial, they moved for reconsideration of the breach of fiduciary duty claim, which the district court granted. The court then certified its decision to reinstate the claim for interlocutory appeal. *See id.* at 1261.

In sum, there is no genuine issue of material fact that any of the defendants violated their fiduciary duties to plaintiffs under ERISA § 404(a). We will deny plaintiffs' motion for summary judgment on Count II and grant defendants' motion.

## IV.

Counts I, VI, and VIII of plaintiffs' amended complaint contain claims of interference with benefits in violation of ERISA § 510, 29 U.S.C. § 1140. This section of ERISA was enacted "primarily to prevent 'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension benefits.'" *Dewitt v. Penn–Del Directory Corp.*, 106 F.3d 514, 522 (3d Cir.1997) (quoting *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan*, 24 F.3d 1491, 1501 (3d Cir.1994)). It provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan; this subchapter, . . ., or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. . . .

29 U.S.C. § 1140. The portions of ERISA § 510 which may possibly apply here are those which make it unlawful for an employer to "discharge" or "discriminate against" a plan participant "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." The Court of Appeals for the Third Circuit has explained that " 'discriminate' . . . should be limited to actions affecting the employer-employee relationship." *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan*, 24 F.3d 1491, 1503 (3d Cir.1994).

To establish an ERISA § 510 violation, plaintiffs must produce evidence showing that the employer engaged in prohibited conduct for the purpose of interfering with the attainment of any right to which the plaintiff may have been entitled. *See id.* at 1502; *Gavalik v. Continental Can Co.*, 812 F.2d 834, 852 (3d Cir.1987). This evidence must include a showing of specific intent by the employer to interfere with ERISA rights. *See Dewitt*, 106 F.3d at 522. "Proof of incidental loss of benefits as a result of a termination will not constitute a violation of section 510." *Id.* Through direct or circumstantial evidence, plaintiffs must show that defendants made "a conscious decision" to interfere with their attainment of ERISA benefits. *Id.* at 523.

### A.

In Count I, plaintiffs claim that defendants violated ERISA § 510 by: (1) creating the VSP; and (2) making "fraudulent misrepresentations," and "failing to disclose relevant information" concerning (a) the likelihood that employees would be involuntarily terminated if they did not accept the VSP and (b) the effect VSP participation would have on their ability to share in a potential future allocation from the MSP/ESOP surplus. They allege that these actions and omissions were undertaken to deprive them of the benefits to which they were entitled under various Conrail ERISA plans.

The VSP resulted from an amendment to Conrail's Supplemental Pension Plan. Its terms did not change or affect the plaintiffs' employment rights or status. Therefore, Conrail's creation of the VSP did not "discharge, fine, suspend, expel, [or] discipline" plaintiffs, nor did it "discriminate" against them. 29 U.S.C. § 1140. As stated previously, "discriminate," in the context of ERISA § 510 is "limited to actions affecting the employer-employee relationship." *Haberern*, 24 F.3d at 1503.

With respect to their claim that the defendants improperly pressured plaintiffs into accepting the VSP through fraudulent misrepresentations and material omissions, plaintiffs rely on the same alleged misrepresentations and omissions in this Count as in Count II. For the reasons explained above, plaintiffs have not adduced evidence that defendants misrepresented the likelihood of involuntary terminations or the effect of VSP participation on their eligibility to share in a potential allocation of the MSP/ESOP unallocated surplus. Nor have plaintiffs raised a genuine issue of material fact that defendants made material omissions regarding the MSP/ESOP or involuntary terminations.

Even if plaintiffs had shown that defendants made misrepresentations or material omissions, they have not demonstrated that defendants did so with the intent to interfere with plaintiffs' ERISA benefits. Plaintiffs appear to argue that defendants acted with the specific intent of interfering with their: (1) rights to severance under the Staff Rationalization Plan; (2) their rights to "other welfare benefits"; and (3) their rights to benefits under the MSP/ESOP. Plaintiffs have not identified precisely which "other welfare benefits" were allegedly the target of defendants' actions. Without any specificity as to which benefits plaintiffs claim are at issue, it is impossible for us to determine whether defendants had the intent to interfere with them.

As to their MSP/ESOP benefits, plaintiffs do not dispute that they have received or will receive all amounts that were allocated to their individual MSP/ESOP accounts. While it is not clear to us, plaintiffs may be arguing that because of their participation in the VSP, they lost the opportunity to accrue additional MSP/ESOP benefits through their own contributions and the matching contributions. This, however, does not advance their cause. " '[W]here the only evidence that an employer specifically intended to violate ERISA is the employee's lost opportunity to accrue additional benefits, the employee has not put forth evidence sufficient to separate that intent from the myriad of other possible reasons for which an employer might have discharged him.' " *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 348 (3d Cir.1990) (quoting *Clark v. Resistoflex Co.*, 854 F.2d 762, 771 (5th Cir.1988)), *abrogated on other grounds, St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Dewitt*, 106 F.3d at 523.

■ In addition, plaintiffs maintain that defendants made the alleged misrepresentations and material omissions with the intent to interfere with their right to severance under the Staff Rationalization Plan. Their position is without merit. According to plaintiffs, the Staff Rationalization Plan provided benefits in the amount of seventy-five percent of one year's salary to involuntarily terminated employees. The VSP, on the other hand, provided at least two years' salary plus additional benefits to separating employees. Even if we assume defendants made the misrepresentations and omissions, plaintiffs benefited from them. They received more than double the amount to which they would have been entitled under the Staff Rationalization Plan. In this regard, Conrail's actions enhanced, not interfered with, plaintiffs' severance benefits.

Plaintiffs have not established that there is a genuine issue of material fact with respect to their claim that defendants made any misrepresentations and omissions with the intent to interfere with any ERISA rights. Defendants' motion for summary judgment on Count I will be granted.

**B.**

Plaintiffs aver in Count VI that defendants interfered with the attainment of their ESOP benefits by amending the MSP/ESOP to implement a method of distributing the unallocated surplus based on

certain defined employee earnings.[15] As noted above, ERISA § 510 makes it unlawful for an employer to "discharge ... or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. "Discriminat[ion]" is "limited to actions affecting the employer-employee relationship." *Haberern*, 24 F.3d at 1503.

■ Unlike Count I, the claims in Count VI do not include any allegation that plaintiffs' employee-employer status was changed in any way. Plaintiffs have not shown that the amendment to the MSP/ESOP changed the employer-employee relationship in "some discriminatory or wrongful way." *Id.* Therefore, plaintiffs have not set forth a genuine issue of material fact as to Count VI.

### C.

Count VIII alleges that defendants intentionally interfered with the attainment of ERISA benefits by those who accepted the VSP and later returned to work at Conrail as independent contractors or "leased" employees. According to plaintiffs, defendants did so by "purposefully return[ing] these class members to nominally non-employee positions (which were actually employee positions) and refus[ing] to acknowledge their employee status." Am.Compl. ¶ 161 (parentheses in original, brackets added). Plaintiffs explain that Conrail acted with the intent to interfere with their rights to "welfare benefits," to severance under the Staff Rationalization Plan, and to distributions from the MSP/

ESOP. Pls' Mem. of Law in Opp. to Defs' Mot. for Sum.J. on all Counts other than Count VII, p. 38.[16]

Plaintiffs must come forth with evidence that it was defendants' specific intent, in creating and implementing the non-employee positions, to deny them ERISA benefits. *See Dewitt*, 106 F.3d at 522. It is not sufficient simply to demonstrate that Conrail deemed every "independent contractor" or "leased" employee ineligible for benefits under its ERISA plans. Virtually every time an employer terminates an employee, that employee is deemed not eligible to accumulate additional benefits. Plaintiffs must direct us to more specific evidence of intent. Once again, they have alleged that defendants intended to interfere with unspecified "welfare benefits." Because plaintiffs have not identified what benefits or which ERISA plans are at issue, we cannot determine whether defendants had a specific intent to interfere with them.

■ Plaintiffs have specified that defendants intended to deny them "distributions" under the MSP/ESOP and severance under the Staff Rationalization Plan. As we stated above, if all that the plaintiffs can show is denial of the opportunity to accumulate more benefits in their pension accounts, this is insufficient evidence of intent for purposes of ERISA § 510. *See Dewitt*, 106 F.3d at 523; *Turner*, 901 F.2d at 347. With respect to the allocation of the MSP/ESOP surplus upon termination of the plan, plaintiffs have not shown that defendants were giving any consideration to terminating the plan at the time they

---

15. Our May 14, 1998 order certified the entire VSP class with respect to this Count. Plaintiffs' contention in their memorandum in opposition to defendants' motion for summary judgment on all Counts other than Count VII that this claim is only asserted by the return-to-work subclass appears to be an unintentional misstatement and, in any event, does not affect our analysis.

16. Plaintiffs also assert that this Count includes a claim that Conrail amended the MSP/ESOP for the purpose of preventing the subclass from attaining a full allocation of the surplus. We cannot discern how this aspect of the Count is distinguishable from that asserted Count VI, except that Count VI was pressed by the entire VSP class. Plaintiffs' challenge to the amendment of the MSP/ESOP does not state a cognizable ERISA § 510 claim because the amendment did not affect plaintiffs' employer-employee status. *See Haberern*, 24 F.3d at 1503.

were hired into "non-employee positions." This is fatal to their claim that defendants placed them into these positions with the specific intent of interfering with their alleged rights to MSP/ESOP benefits.

Plaintiffs raise the same arguments about Conrail's intent to interfere with their right to severance under the Staff Rationalization Plan here as they did in Count I. They are without merit. We conclude that plaintiffs' have not raised a genuine issue of material fact that defendants intentionally interfered with these severance benefits under Count VIII.

## V.

Counts III and IX allege that defendants failed to provide plaintiffs with the benefits to which they were entitled under various Conrail pension and welfare benefit plans, including the MSP/ESOP, in violation of § 512(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). That section provides, "A civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan...." 29 U.S.C. § 1132(a)(1)(B).

### A.

It is plaintiffs' position that Conrail failed to raise any grounds as the basis for its motion for summary judgment as to Count III with respect to any ERISA plan benefits other than those under the MSP/ESOP. As a result plaintiffs submit they have no duty to present any evidence as to those other plan benefits under Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs' position is misplaced. Rule 56(b) provides, "A party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." The Supreme Court has explained that "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Defendants' memorandum in support of their motion for summary judgment clearly acknowledges that Count III involves multiple Conrail pension and welfare benefit plans. Defendants based their motion on the ground that plaintiffs were not entitled to any additional benefits under the terms of any Conrail pension or welfare benefit plans. It is plaintiffs' burden to establish that there is a genuine issue of material fact with respect to this claim. They have failed to do so.

As to their benefits under the MSP/ESOP, plaintiffs maintain that the plan amendments which created the disputed method of distributing the surplus diminished the amount of the unallocated surplus to which they were entitled. It is plaintiffs' burden to call our attention to places in the record supporting their position that the benefits they are claiming are ones that are "due ... under the terms of ... [the] plan." 29 U.S.C. § 1132(a)(1)(B). They have not done so. Under the plan, they were entitled only to the amounts which had been allocated to their individual accounts. It goes without saying that the unallocated surplus had not been so allocated. Therefore, the MSP/ESOP amendment they challenge did not deprive them of any plan benefit to which they were entitled. *See Bennett*, 1997 WL 700538, at *5; *Bennett*, 168 F.3d at 676–78.

Defendants' motion for summary judgment on Count III will be granted.

### B.

Count IX is a claim for ERISA benefits asserted by the subclass of plaintiffs who returned to work at Conrail as independent contractors or leased employees. These plaintiffs assert that in their "nominally non-employee" positions they were entitled to benefits under Conrail's pension

and welfare benefit plans, including the MSP/ESOP, the APAR and APAR Plus,[17] Life Insurance, Vacation, Holiday, medical, Dental, Sick Time Leave, Short Term Disability, Long Term Disability, Railroad Retirement Act Plan, Supplemental Pension Plan, Long Term Incentive Plan, Tuition Reimbursement, and "other paid leave and stock purchase plans." Am.Compl. ¶¶ 26, 164.

Once again, plaintiffs argue that defendants have failed to set forth the grounds upon which their motion is based and therefore plaintiffs should have no duty, or only a limited duty, to respond. We believe defendants have adequately stated the grounds for their motion. They have asserted that "plaintiffs cannot meet the eligibility requirements described in Conrail's plans, [and] they are not entitled to benefits." Def's Mem. of Law in Support of Mot. for Sum.J. on all Counts other than Count VII, p. 56. It is plaintiffs' burden to establish that there is a genuine issue of material fact concerning their eligibility for benefits under each of Conrail's ERISA plans.

Plaintiffs seem to contend that the definition of "employee" in each of the relevant ERISA plans is critical to their claim. As to most of the above-named plans, we have no evidence before us as to their terms and precisely why plaintiffs would qualify as employees under them. "The award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself." *Dewitt v. Penn–Del Directory Corp.*, 106 F.3d 514, 520 (3d Cir.1997). Plaintiffs have made it impossible for us to assess their claim.

They have only directed us to evidence of the plan terms and definitions for the Staff Rationalization Plan and the MSP/ESOP.[18] They have failed to come forth with a genuine issue of material fact as to all other plans.

In order to assess the claims about benefits allegedly due under the terms of the MSP/ESOP and the Staff Rationalization Plan, we must first determine our scope of review. The Supreme Court has explained that a court must review de novo a denial of benefits "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In the latter situation, the court is to pass upon a benefits denial under the narrower arbitrary and capricious standard. *See id.* Thus, under *Firestone,* whether the administrator or fiduciary has discretionary authority over eligibility determinations depends upon the terms of the benefit plan. *See Heasley v. Belden & Blake Corp.,* 2 F.3d 1249, 1254 (3d Cir.1993).

Plaintiffs seem to assert that individuals who returned to work after their VSP termination date were entitled to receive allocations of the MSP/ESOP surplus based upon the income they earned up until their VSP termination date in addition to the income they earned in their "non-employee" positions. They must raise a genuine issue of material fact that they were entitled to these monies "under the terms of … [the] plan," 29 U.S.C. § 1132(a)(1)(B).[19]

17. "APAR" stands for "Annual Performance Achievement Reward."

18. They have also provided us with the terms of the 1997 APAR Plan, but according to plaintiffs this is not an ERISA plan. *See* Pls' Mem. of Law in Opp. to Defs' Mot. for Sum.J. on all Counts other than Count VII, p. 50. Therefore, a denial of APAR benefits is not actionable under 29 U.S.C. § 1132(a)(1)(B).

19. In their memorandum of law in opposition to defendants' motion for summary judgment, plaintiffs also appear to be challenging in this Count the propriety of the amendment which established the method of allocating the surplus. The amended complaint does not make such a challenge under Count IX. Even if it did, we do not believe a challenge to that amendment is actionable under the statute plaintiffs have cited in this Count, § 512(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). That section provides, in full, "A civil action may be brought … by a participant or beneficiary … to recover bene-

■ Article XIII of the MSP/ESOP clearly states that "[t]he Administrative Committee shall have sole responsibility for the general administration of this Plan." § 13.1. It has the power "[t]o interpret the Plan and to decide any and all matters arising under it, including the right to remedy possible ambiguities, inconsistencies or omissions" and the power "[t]o compute the amount of benefits payable to any Participant or Beneficiary under the Plan." § 13.2. We believe that this language grants the Administrative Committee discretion to make eligibility determinations. *See, e.g., Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 42, 45 (3d Cir.1993). Therefore, we are to review the Administrative Committee's denial of plaintiffs' MSP/ESOP benefits under the arbitrary and capricious standard. We are " 'not free to substitute . . . [our] own judgment for that of the defendants in determining eligibility for plan benefits.' " *Id.* at 45 (citation omitted). We must affirm the Administrative Committee's decision as long as it is not " 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Id.* (citation omitted).

■ If the administrator was operating under a conflict of interest, we must weigh that factor in deciding whether the administrator abused its discretion. *See Firestone*, 489 U.S. at 115, 109 S.Ct. 948. According to plaintiffs, the Administrative Committee was acting under a conflict of interest when it denied their claims because it was also the employer. While some amount of conflict is present whenever an employer acts as a plan administrator, *see Abnathya*, 2 F.3d at 45 n. 5, we do

not perceive the conflict to be a substantial one here. The terms of the MSP/ESOP did not entitle Conrail to any residual portion of the plan surplus.[20] The plan, as amended, provided that whatever surplus existed would be allocated to individuals' accounts, not to Conrail.

Plaintiffs further submit that the Administrative Committee abused its discretion[21] by failing to consider all evidence relevant to the determination of the meaning of "employee" and "contractor." However, plaintiffs have not identified what evidence they are alleging the Administrative Committee erroneously failed to consider.

The Savings Plan Administrative Committee of the MSP/ESOP issued a letter to plaintiffs' counsel notifying them of its denial of their claim. The letter explained that at the time plaintiffs made their claim, the terms of the plan stated that any unallocated surplus remaining after payment of all ESOP loans would first be allocated as Matching Contributions for the period ending April 30, 1997. Thereafter, any remaining amount would be allocated, for the 1996 Plan Year, to Participants in proportion to the ratio which the Supplemental Earnings of each Participant for the 1996 Plan Year bears to the Supplemental Earnings of all Participants for such Plan Year. For 1997, and future years until the monies were depleted, whatever remained would be allocated in the same manner as in the preceding step to all Eligible Participants (a Participant who is an Employee as of the last day of such Plan Year). *See* Conrail Matched Savings Plan, § 4.7(e). "Supplemental Earnings" were "wages . . .

---

fits due to him *under the terms of his plan*, to enforce his rights *under the terms of the plan*, or to clarify his rights to future benefits *under the terms of the plan*." 29 U.S.C. § 1132(a)(1)(B) (emphases added). Their challenge to the MSP/ESOP amendment does not fit into any of the categories listed in the statute.

**20.** At § 14.1 the plan provided, "No amendment shall make it possible for any assets of

the Plan to be used for or diverted to any purposes other than for the exclusive benefit of Participants and Beneficiaries." Conrail Matched Savings Plan, effective January 1, 1996, as amended July 15, 1997.

**21.** Courts in this circuit recognize that the abuse of discretion standard is equivalent to the arbitrary and capricious standard. *See Abnathya*, 2 F.3d at 45 n. 4.

paid to an Employee." *Id.* at Article I. An "Employee" was defined as "any person employed by and actually rendering services for Conrail ... who is classified as an employee by Conrail ... for Federal income tax withholding purposes.... 'Employee' does not include any person classified by Conrail ... as an independent contractor or as a leased employee...." *Id.* The plan expressly excluded from the surplus allocation calculation any amounts individuals earned while in positions Conrail deemed independent contractor or leased employee positions.

■ The Committee's letter reviewed the above terms, the facts regarding the VSP, and the independent contractor agreements involving plaintiffs. It noted that, after their employment was terminated through the VSP, none of the plaintiffs received payments from Conrail that were subject to federal income tax withholding, and hence none of them fit within the plan's definition of an "Employee." The MSP/ESOP Administrative Committee's denial of plaintiffs' claims to a larger portion of the surplus was clearly reasonable.

Plaintiffs claim that when they were terminated from their "nominally non-employee" positions, they were entitled to severance benefits under the Staff Rationalization Plan. We determine our scope of review, once again, by looking to the terms of the plan. *See Firestone*, 489 U.S. at 115, 109 S.Ct. 948; *Heasley*, 2 F.3d at 1254. The Staff Rationalization Plan provided that the "Plan Administrator ... has the sole responsibility for the administration of the Plan." His or her responsibilities included the power "[t]o interpret the Plan, and to decide any and all matters arising under it; ... [and t]o compute the amount of any Participant's benefits in accordance with the terms of the Plan." Staff Rationalization Non–Agreement Employees' Separation Allowance Plan, §§ 3 and 5(b), (c). This language granted the Administrator discretionary authority to make benefit determinations. The arbitrary and capricious standard controls.

*See Firestone*, 489 U.S. at 115, 109 S.Ct. 948.

■ The Administrator, plaintiffs argue, was acting under a conflict of interest because: (1) the Staff Rationalization Plan was an unfunded plan; and (2) the Administrator failed to consider all relevant evidence. We are to weigh any conflict of interest in deciding whether the Administrator abused its discretion. *See id.* When an employer also serves as administrator of a plan, its conflict of interest may be greater when the plan is unfunded. However, we do not believe that the mere fact that the Staff Rationalization Plan was unfunded is sufficient reason, by itself, for us to find that the Administrator's determination was arbitrary and capricious.

■ Plaintiffs' contention that the Administrator abused his discretion by failing to consider all the relevant evidence cannot stand based on the record before us. They argue that the Administrator failed to "look at any IRS materials or check the accuracy of the recommendation of benefits counsel." Pls' Mem. of Law in Opp. to Defs' Mot. for Sum.J. on all Counts other than Count VII, p. 45. Conrail's benefits attorney wrote a memorandum to the Staff Rationalization Plan Administrator, in which the attorney reviewed plaintiffs' claims and the background facts, and then made a recommendation that the claims be denied. In that seven page memorandum, there are two sentences, just before the conclusion, regarding IRS materials. The benefits attorney stated that the IRS audited Conrail's employment tax practices in 1996, and according to federal law, that audit precluded Conrail from retroactively re-characterizing the employment status of individuals deemed independent contractors. The Staff Rationalization Plan Administrator issued to plaintiffs' attorney a denial letter, in which he repeated the benefits counsel's remark regarding the IRS audit. Even if the Administrator did not review the IRS materials or check the accuracy of the benefits counsel's conclu-

sion regarding federal law, this was not an abuse of discretion.

As previously stated, plaintiffs contend that when they were terminated from their independent contractor and leased employee positions, they were entitled to severance benefits under the Staff Rationalization Plan. The Administrator's denial letter noted that the plan provided for benefits to be paid to an "Employee who is deprived of employment.... " Staff Rationalization Plan, § 8. An "Employee" was defined as "any person employed, actually rendering services for the Corporation within the United States, whose remuneration from the Corporation is subject to Federal income tax withholding.... " *Id.* at § 1. Once the claimants terminated their employment through the VSP, the Administrator stated, they were no longer Conrail "Employees." He reviewed the independent contractor agreements involving plaintiffs and Conrail payroll records. The latter indicated that after their termination via the VSP, none of the claimants received payments from Conrail that were subject to federal income tax withholding. The Administrator's denial of the Staff Rationalization Plan claim was adequately supported and was not an abuse of his discretion.

We will grant summary judgment in favor of defendants on Count IX.

## VI.

Plaintiffs have abandoned their state law claims in Counts IV and V for fraud and negligent misrepresentation. Thus, defendants' motion for summary judgment on these Counts will be granted.

## VII.

In Counts X and XI, the named plaintiffs have brought individual claims for non-ERISA wages and benefits. In Count X, plaintiffs claim that defendants wrongfully denied them wages and benefits during the time they held "nominally nonemployee" positions, in violation of the

Pennsylvania Wage Payment and Collection Law ("WPCL"), Pa.Stat.Ann. tit. 43, § 260.3 (West 1992). The WPCL requires an employer promptly to pay wages, fringe benefits, and wage supplements to its employees. *See* Pa.Stat.Ann. tit. 43, § 260.2a. An employee to whom "any type of wages is payable" may bring a civil action pursuant to Pa.Stat.Ann. tit. 43, § 260.9a(a). The "WPCL does not create a right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned." *Weldon v. Kraft, Inc.,* 896 F.2d 793, 801 (3d Cir.1990); *see also Banks Eng'g Co., Inc. v. Polons,* 697 A.2d 1020, 1024 (Pa.Super.1997), *appeal granted,* 550 Pa. 715, 706 A.2d 1210 (1998).

Plaintiffs' reliance on our discussion of Count X in our January 6, 1998 memorandum regarding defendants' motion to dismiss is misplaced. They may no longer rest on the allegations of their amended complaint. At this point they must show the existence of a genuine issue of material fact. They have not pointed to any contractual provision between them and Conrail in effect during the relevant time period.

Defendants are entitled to summary judgment on Count X. *See Weldon,* 896 F.2d at 801.

In Count XI, plaintiffs allege that defendants' refusal to provide them certain non-ERISA benefits breached a contract between the parties. They aver that "[c]entral to this determination is whether the service agreements were in fact contracts defining the terms of the return to work [positions] or whether they were in effect a sham, a paper trail created by Conrail to avoid paying compensation ... and fringe benefits.... " Pls' Mem. of Law in Opp to Defs' Mot. for Sum.J. on all Counts other than Count VII, p. 51. Plaintiffs have nothing to support their claim. They do not direct our attention to any contractual term. If the "service agreements" in ef-

fect while they were in their return-to-work positions were a "sham," as plaintiffs contend, then they are left with no written agreements in effect while they were in their return-to-work positions.

Defendants are entitled to summary judgment on Count XI.

## VIII.

Count XII, which is brought individually by each of the named plaintiffs, asserts that Conrail was unjustly enriched by its "wrongful conduct."[22] In support of this pendant state law claim, plaintiffs argue that Conrail received their services "at a rate of compensation far below that of the rate which would [have] be[en] required to replace [them]." Pls' Mem. of Law in Opp. to Defs' Mot. for Sum.J. on all Counts Other than Count VII, p. 52 (footnote omitted).

 Unjust enrichment is an equitable doctrine. *See Styer v. Hugo,* 422 Pa.Super. 262, 619 A.2d 347, 350 (1993), *aff'd,* 535 Pa. 610, 637 A.2d 276 (1994). Pennsylvania courts have explained that the elements of an unjust enrichment claim are: (1) the plaintiff conferred benefits upon the defendant; (2) the defendant realized those benefits; and (3) the defendant accepted and retained the benefits under circumstances in which it would be inequitable for it to retain them without payment of value. *See id.; Schenck v. K.E. David, Ltd.,* 446 Pa.Super. 94, 666 A.2d 327, 328 (1995).

As for those plaintiffs who did not return to work after their VSP termination date, they have failed to note any evidence that defendants were unjustly enriched at their expense. They received full compensation and benefits as regular Conrail employees up to their termination dates, plus the benefits to which they were entitled as participants in the VSP. After their termination dates, they did not "confer bene-

fits," upon Conrail. We cannot discern any basis for their claim that Conrail received benefits from them under circumstances in which it would be inequitable for it to retain them without additional payments.

 Those plaintiffs who returned to work after their termination dates appear to claim that the compensation they received in these "nominally non-employee," positions was unjust for the amount of services they provided to Conrail. However, evidence is lacking to show what the return-to-work employees received or what value they conferred upon Conrail. Furthermore, the evidence indicates that these individuals voluntarily entered into the agreements which established their compensation during their return-to-work period. In short, no inequity has been demonstrated.

Defendants' motion for summary judgment on Count XII will be granted.

## IX.

The return-to-work plaintiffs allege, in Count XIII, that defendants breached their fiduciary duties by refusing to provide plaintiffs with benefits when they returned to work after their VSP termination dates, in violation of ERISA § 404(a), 29 U.S.C. § 1104(a). As stated previously, in our discussion of Count II, a fiduciary breaches the obligations imposed by ERISA if it makes affirmative material misrepresentations to plan participants or beneficiaries about the terms of the plan or if it makes material omissions knowing its silence may cause participants or beneficiaries harm. *See Unisys,* 57 F.3d at 1264; *Bixler,* 12 F.3d at 1300; *Fischer,* 994 F.2d at 135. In order to prove a claim of breach of fiduciary duty, plaintiffs must establish four elements: (1) the defendants' fiduciary status; (2) material misrepresentations; (3) defendants' knowl-

**22.** We previously concluded that this claim survives only with respect to non-ERISA benefits and wages. *See Bunnion,* No. CIV. A. 97-4877, 1998 WL 32715, at *9 (E.D.Pa. Jan. 6, 1998).

edge of the confusion among beneficiaries; and (4) resulting harm to plaintiffs. *See Unisys*, 57 F.3d at 1265.

In their memorandum of law in opposition to defendants' motion for summary judgment, plaintiffs maintain that defendants breached their fiduciary duties by misrepresenting to plaintiffs, when they were considering applying for the VSP, that Conrail would not "rehire" those who accepted the VSP.[23] They point to the following question and answer, which was included in the VSP information materials provided to employees in March and April, 1996:

Q. If I separate from Conrail, can I be rehired?

A._ No. An employee who receives a voluntary separation payment cannot be rehired with Conrail or its affiliates.

■■■ Even if we were to assume this was a misrepresentation, plaintiffs have not raised a genuine issue of material fact that there was resulting harm. If they had known that Conrail might hire some of them back, this would have been a *greater* incentive to accept the VSP. They could receive all the severance benefits under the VSP and then still stay on Conrail's payroll. No one is claiming that he or she would not have accepted the VSP if it had been known that Conrail might rehire the VSP participants as independent contractors. Plaintiffs have not explained, and we can perceive of no reason, why the alleged misstatements caused them to retire earlier than they would have if they knew Conrail might rehire some of them. *See In re Unisys Corp. Retiree Medical Benefits ERISA Litig.*, 957 F.Supp. 628, 639, 642 (E.D.Pa.1997).

Additionally, even if we were to assume that the statements were misrepresentations, they do not rise to the level of materiality. "[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if and when to retire." *Fischer*, 994 F.2d at 135. If defendants had not made the "misstatements,"the fact remains that no one would have known how many VSP participants might be rehired, what one's chances were for being rehired, or what would be the terms under which one would be rehired. In short, the alleged misstatements about having no intent to rehire would not have misled a reasonable employee in making an "adequately informed decision" about whether to accept the VSP. *Id.*

Plaintiffs also point to no evidence that the statement was inaccurate when made. As we noted before, the fact that plaintiffs were hired into "independent contractor," or "leased" employee status months after the statements were made does not raise a genuine issue of material fact that the statements were false. *Cf. Frahm v. Equitable Life Assurance Soc'y*, 137 F.3d 955, 961 (7th Cir.), *cert. denied*, 525 U.S. 817, 119 S.Ct. 55, 142 L.Ed.2d 43 (1998).

We will grant defendants' motion for summary judgment on Count XIII.

## X.

■■■ Plaintiffs and defendants both have moved for summary judgment on Count XIV, an equitable estoppel claim. In order to establish this claim, plaintiffs must prove: (1) a material misrepresentation; (2) reasonable and detrimental reliance upon the misrepresentation; and (3) extraordinary circumstances.[24] *See Curcio*

---

23. Under this articulation, any of the VSP participants could have asserted this claim, not just the return-to-work plaintiffs. We question whether this was really the claim asserted in the amended complaint. However, as Count XIII incorporates every previous paragraph of the amended complaint, it appears to be broad enough to support plaintiffs' most recent articulation, and we will analyze it accordingly.

24. Although *Curcio* used the word "representation," we believe it meant "misrepresentation." *See, e.g., In re Unisys Corp. Retiree Medical Benefit ERISA Litig.*, 58 F.3d 896, 907 (3d Cir.1995).

*v. John Hancock Mut. Life. Ins. Co.*, 33 F.3d 226, 235 (3d Cir.1994). Plaintiffs direct us to the same alleged misrepresentations in support of this claim as they relied on in support of Count II. For all the reasons stated in our discussion of Count II, plaintiffs have failed to show that defendants made any misrepresentations.[25] Even if the March 19, 1996 e-mail about the MSP/ESOP surplus were a misrepresentation, plaintiffs cannot establish that they reasonably relied upon it. The statement was a forecast of an all too uncertain future, with too many contingencies and unknowns to support reasonable reliance.

We will deny plaintiffs' motion for summary judgment on this Count and grant defendants' motion.

## XI.

Finally, defendants move for summary judgment as to Count VII, in which a subclass of plaintiffs alleges that Conrail violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* The subclass consists of those plaintiffs who accepted the VSP and were over 40 when they returned to work at Conrail as independent contractors or leased employees. The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623. In essence, these plaintiffs contend that when they returned to work, they were subject-ed to disparate treatment because of age when they were denied "full benefit employee status" while Conrail hired younger individuals as "full benefit employees." [26] Significantly, plaintiffs concede that the implementation of the VSP did not constitute a "constructive discharge." Pls' Mem. of Law in Opp. to Def's Mot. for Sum.J. on Count VII, p. 25.

To prove a prima facie case of age discrimination under the ADEA, plaintiffs must establish that: (1) they were over 40 years of age; (2) they were qualified for the positions at issue; (3) they suffered an adverse employment action; and (4) they were ultimately replaced by, or the position was filled by, a younger person. *See Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 973–74 (3d Cir.1998). Those elements, however, are not inflexible. *See Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir.1994). Replacement by younger employees, for example, is not required when the case involves a reduction in force or when events made it "economically impossible" to hire substitutes. *Id.*

Plaintiffs have failed to come forward with any evidence that they suffered an adverse employment action either when they were accepted into the VSP or when they were rehired. This failure is fatal to their age discrimination claim. If employees had not accepted the VSP, they faced the possibility of termination with less severance pay. The VSP allowed them to receive enhanced severance benefits with

---

**25.** Plaintiffs also argue that their equitable estoppel claim is based on defendants' "material omissions." In our discussion of Count II, *supra*, we concluded that there were no material omissions. Additionally, plaintiffs have cited, and we have found, no cases in which equitable estoppel claims were based upon omissions. The elements of an equitable estoppel claim as enunciated by the Court of Appeals for the Third Circuit appears to preclude a claim based solely upon omissions.

**26.** "Disparate treatment" occurs when an employer treats some individuals less favorably than others because of a protected char-acteristic like race, religion, sex, or age. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In order to establish such a claim, "proof of discriminatory motive is critical." *Id.* "Disparate impact" claims, on the other hand, involve facially neutral employment practices that "fall more harshly on one group than another and cannot be justified by business necessity." *Id.* A plaintiff need not produce evidence of discriminatory motive in order to establish a disparate impact claim. *See id.* Plaintiffs have not argued that a disparate impact theory applies in this case.

the possibility of continuing their Conrail full benefit employment for up to one year. They were given nearly two months to consider applying for the VSP, and there is no evidence that they were misled in any material way about its terms. For many Conrail employees, this option, which was voluntary, was preferable to a more uncertain future. The VSP was a *benefit* offered to these plaintiffs, not an adverse employment action. *See Henn v. Nat'l Geographic Soc'y,* 819 F.2d 824, 826–27 (7th Cir.1987).

When some of those who accepted the VSP were later hired as independent contractors, that, too, was a benefit to those individuals. We cannot consider Conrail's decision to deny these employees "full benefit" positions in a vacuum. In order to assess their contention that they were subjected to adverse employment actions, we must view "the record as a whole." *Connors,* 160 F.3d at 974. The events during the months immediately preceding that decision put Conrail's decision in context. The company was in the process of accomplishing a massive workforce reduction. The VSP materials clearly informed plaintiffs they could not be "rehired." They accepted two years' salary plus additional monies as severance benefits. Then, as Conrail's Senior Vice President of Organizational Performance, Frank Nichols, testified at his deposition, after employees were terminated through the VSP and Voluntary Retirement Program, Conrail determined it needed additional employees to help with the transition to a leaner company. In making the transition, it began to utilize, as independent contractors, some of those who had accepted the VSP. Conrail intended that it would only need their services for a "limited" period of time. After having accepted termination of their employment and having received at least two years' salary, the independent contractors continued to have a steady stream of income. In short, plaintiffs were "not fleeing from a stick, ... [they were] reaching for a carrot." *Id.* at 975.

Plaintiffs contend, however, that age discrimination exists because Conrail hired younger individuals as "full benefit employees" while rehiring plaintiffs without providing full benefits. Plaintiffs must now come forth with facts that these "full benefit employees" were similarly situated with them in terms of employment categories and qualifications. *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 645 (3d Cir.1998). However, plaintiffs have not done so. They have not called to our attention any evidence of what positions these younger employees assumed, relative to those assumed by the independent contractors and leased employees.

■ Even if plaintiffs had established a prima facie case, they would have to do more here in order to survive summary judgment. Conrail has explained that it refused to hire plaintiffs as full benefit employees because they had just been terminated through the VSP. This is "a legitimate, nondiscriminatory reason" for its decision. *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997) (en banc). Plaintiffs must now come forward with evidence that the employer's explanation was not believable or that age discrimination was more likely than not a motivating cause for its decision to rehire them as independent contractors or leased employees. *See id.* at 1113. Plaintiffs have not done so. Therefore, as in *Keller,* summary judgment in favor of the defendants is appropriate. The record clearly demonstrates that Conrail considered these plaintiffs to be in a special category not because of their age, but because they opted for the VSP. Plaintiffs have not shown that anyone who participated in the VSP was rehired into a "full benefit" position. Of the 88 employees who returned to work as independent contractors or "leased" employees after termination via the VSP, approximately fourteen of them were under the age of 40, and thus outside

of the protected class.[27] In addition, plaintiffs' affidavits are not helpful to their position. The affidavits relate only to the alleged motive for offering the VSP, not Conrail's decision about later rehiring VSP participants as independent contractors or leased employees.

The Supreme Court has stated, "[T]here is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Merely because the VSP was open to employees with 15 or more years of Conrail service does not raise a genuine issue of material fact that the policy of not rehiring VSP participants into full benefit positions was unlawfully age discriminatory. "[A]ge and years of service are analytically distinct, [and] an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Id.* at 611, 113 S.Ct. 1701. Here, plaintiffs essentially ask us to conclude that the rehiring policy was age discriminatory because it discriminated against those who had voluntarily accepted the VSP, that is those who necessarily had fifteen or more years of service. This line of reasoning is especially deficient since plaintiffs concede that the implementation of the VSP did not constitute a constructive discharge.

Plaintiffs also rely on statistical evidence as proof of Conrail's discriminatory intent. An analysis conducted by one of their experts compared the ages of employees Conrail hired in "full benefit" positions after April 30, 1996 to those of the plaintiffs. The analysis concludes that 82.6% of those hired into "non-benefit positions" were over 40 years of age, that only 23.5% were under 40 years, and that the probability is extremely low that this resulted from age-neutral decisions.

Even if what plaintiffs contend about their statistical analysis is true, there is still no genuine issue of material fact that defendants discriminated against plaintiffs on the basis of age. The Supreme Court has explained that "statistics can never in and of themselves prove the existence of a pattern or practice of discrimination, or even establish a prima facie case shifting to the employer the burden of rebutting the inference raised by the figures." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Moreover, the usefulness of statistical analyses "depends on all of the surrounding facts and circumstances." *Id.* at 340, 97 S.Ct. 1843. In a disparate treatment case, the plaintiff must prove that age "actually motivated the employer's decision." *Hazen Paper,* 507 U.S. at 610, 113 S.Ct. 1701. The statistical analysis at issue here did not take into account whether the employees had or had not been terminated through the VSP. As a result, it is fundamentally flawed and has no probative value in determining Conrail's intent.

An alternative to making out an age discrimination claim under the above burden-shifting framework is to produce direct evidence of discrimination. *See Connors,* 160 F.3d at 976. Even in a direct evidence case, however, plaintiffs must establish that they were subjected to an adverse employment action. *See Connors,* 160 F.3d at 976–77. As we have already discussed, plaintiffs have not come forth with evidence of this element of their claim.

In any event, plaintiffs would still face a "high hurdle" in making out a direct evidence case. *Id.* (citation omitted). There must be evidence "that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their deci-

---

27. These figures come from plaintiffs' expert's statistical analysis, dated December 15, 1998. We use the word "approximately" because the expert's report only lists these individuals' ages as of April 30, 1996, but we believe the relevant date would be later, when Conrail "refused" to hire them as "full benefit employees."

sion.'" *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring); *see also Connors,* 160 F.3d at 976. The facts must be "'so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production.'" *Connors,* 160 F.3d at 976 (quoting *Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3d Cir.1994)). The affidavits supplied by plaintiffs do not support a direct evidence case. Not one says a word about discrimination with respect to the rehiring of class members as independent contractors or leased employees. Also, there is no evidence that the alleged remarks referred to in the affidavits were made by the decisionmakers who made the rehiring determinations or that they placed "substantial negative reliance" on age. *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring); *see also Connors,* 160 F.3d at 976. Evidence of "stray remarks in the workplace" and remarks by "nondecisionmakers" does not shift the burden of proof to defendant. *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring); *see also Walden v. Georgia–Pacific Corp.,* 126 F.3d 506, 513–14 (3d Cir.1997), *cert. denied,* 523 U.S. 1074, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998). Therefore, the affidavits are not direct evidence of age discrimination.

Accordingly, plaintiffs have failed to prove that there is a genuine issue of material fact that they were subjected to unlawful age discrimination, and we will grant defendants' motion for summary judgment on Count VII.

## XII.

In conclusion, we will deny plaintiffs' motion for summary judgment on Counts II and XIV. We will grant defendants' motions for summary judgment on Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, and XIV. We will deny defendants' motion for additional discovery as moot.

*ORDER*

AND NOW, this 23rd day of March, 1999, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the motion of plaintiffs for summary judgment on Counts II and XIV of the amended complaint is DENIED;

(2) the motions of defendants for summary judgment on Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, and XIV are GRANTED;

(3) the motion of defendants for additional discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure is DENIED as moot; and

(4) judgment is entered in favor of defendants Consolidated Rail Corporation, Consolidated Rail Corporation Matched Savings Plan, Consolidated Rail Corporation Matched Savings Plan Administrative Committee, Consolidated Rail Corporation Supplemental Pension Plan, Consolidated Rail Corporation Supplemental Pension Plan Administrative Committee, Flexible/Medical/Dental Dependent Plan, Life Insurance, Dismemberment and Long Term Disability and Retirees Life Insurance Plan, Severance Plan, Deborah A. Melnyk, Richard J. Davison, Peter F. Barr, Christian D. Hill, Gerhard A. Thelen, Marianne S. Gregory, John A. McKelvey, Richard D. Huffman, Dale A. Shaub, and the Fiduciaries and Administrators of the Foregoing Plans and against plaintiffs John J. Bunnion, Jr., Anthony D. Falcone, C. Dyana Reed, Frances E. Bronson, George Hall, Deborah Daley, and John L. Raybuck on behalf of themselves and all similarly situated persons on Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, and XIV of the amended complaint.